# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)*<br><br>1278 West 27th Street,<br>San Bernardino, California 92405<br>("SUBJECT PREMISES") | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  5:22-MJ-00032

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Sections | Offense Descriptions |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | SEE ATTACHED AFFIDAVIT |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David Madero, Special Agent, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state:  Riverside, CA

Hon. Shashi H. Kewalramani, U. S. Magistrate Judge
_____
*Printed name and title*

AUSA: Byron Tuyay, (951) 276-6230

**AFFIDAVIT**

I, David Madero, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is also made in support of an application for a warrant to search the following:

a.     1278 West 27th Street, San Bernardino, CA 92405("SUBJECT PREMISES 1") as described more fully in Attachment A-1;

b.     a Honda Accord bearing California license plate 8WQL001 ("SUBJECT VEHICLE 1"), as further described in Attachment A-2; and

c.     the person of Rafael VARELA Angulo ("VARELA"), as further described in Attachment A-3; and

2.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances, distribution of controlled substances), 21 U.S.C. § 843(b) (use of a communications facility in furtherance thereof) and 21 U.S.C. § 846 (conspiracy and attempt to possess with intent to distribute, and to distribute, controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

is sufficient probable cause for the requested search warrants,
and does not purport to set forth all of my knowledge of or
investigation into this matter. Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent with the United States Department
of Homeland Security (DHS), Immigration and Customs Enforcement
(ICE), Homeland Security Investigations (HSI) and have been so
employed since December of 2018. I am currently assigned to the
HSI Calexico, California Office. I graduated from the HSI Basic
Training Academy located in Glynco, GA. The 27-week academy
curriculum covers specialized training in the Immigration and
Naturalization Act, Customs Law, Criminal Law and Statutory
Authority, as well as the Criminal Investigator Training Program
(CITP). I am an "investigative or law enforcement officer of the
United States" within the meaning of 18 U.S.C. Section 2510(7)
and am empowered to conduct investigations of, and to make
arrests for, offenses enumerated in Title 18, U.S.C., Section
2516. I am cross designated and have the authority to conduct
Title 21 investigations and enforcement activities regarding
violations of Title 21.

5.    Prior to becoming a Special Agent with HSI, I was a
United States Border Patrol Agent-Intelligence, United States
Border Patrol ("USBP") since April of 2007. During my employment
with the USBP, I worked on various complex investigations for
various violations of Title 21 and Title 8. During this time, I

made arrests, drafted affidavits for search and seizure warrants, arrest warrants, tracking warrants, prepared reports in state and federal proceedings, and provided sworn testimony in cases, and also completed separate assignments as a Task Force Officer with the Drug Enforcement Administration (DEA) and HSI.

6.     During my assignments as TFO with DEA and HSI, I participated in and conducted investigations of violations of various Federal and State criminal laws, including unlawful possession with intent to distribute controlled substances, distribution of controlled substances, use of communication facilities to commit narcotics offenses, importation of controlled substances, conspiracy to import, possess, and distribute controlled substances, all in violation of federal narcotics laws. These investigations resulted in arrests of individuals who imported, smuggled, received and distributed controlled substances including cocaine, heroin, methamphetamine, and marijuana. These investigations also resulted in arrests of individuals involved in smuggling bulk U.S. currency from the United States to Mexico. Through these investigations, my experience, and training, as well as discussing the methods and practices of narcotics traffickers with numerous law enforcement officers and confidential sources, I have become familiar with the operations of drug trafficking organizations in the United States and Mexico. Furthermore, I have acted as undercover agent during various investigations.

7.    I have participated as the undercover agent (UC) during "buy walk" and "buy bust" operations. On multiple occasions, I have acted as team leader for confidential source buy walk operations. I have conducted telephone toll analysis, records research, physical and electronic surveillance, and have participated in wiretap investigations. I have used telephone records and bills, financial records, ledgers, and other documents to identify drug trafficking organization co-conspirators. I have also participated in debriefings of many individuals who were arrested and later cooperated with law enforcement. I have been involved in investigations in which court-authorized or electronic wire interceptions were utilized to further the investigation. My involvement has included assisting with surveillance, monitoring intercepted communications, and preparing reports of the intercepted communications. I have also been a case agent for a court-authorized wiretap investigation in the United States District Court, Southern District of California.

8.    Based on my training and experience, I am familiar with how drug traffickers communicate and operate. For example, I am aware that drug traffickers frequently discuss criminal activity using cellular telephones and often use coded language to obscure these conversations. I also know that drug traffickers change telephones as a means to evade detection by law enforcement. Moreover, I know that drug traffickers obtain telephones from third parties and or subscribe to them in fictitious names in order to mask the true identity of the

4

individuals using the telephones. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money, which represents the proceeds of drug trafficking and other criminal activity.

### III. **SUMMARY OF PROBABLE CAUSE**

9. In 2019 and 2020, HSI conducted an investigation into an international drug-trafficking organization based in Mexicali, Mexico that has smuggled substantial quantities of methamphetamine and other controlled substances into the United States, in the Southern and Central Districts of California. Based on this investigation, on January 20, 2022, a grand jury in the Southern District of California returned a true bill of indictment against multiple participants in the organization, including VARELA. Based on surveillance, controlled purchases, drug seizures, and other efforts, investigators have shown that VARELA is a participant in trafficking activity; these efforts, in addition to wiretaps, have shown that the activity is connected to the ongoing efforts of a drug-trafficking organization. A federal arrest warrant has been issued for VARELA based on the indictment. This warrant seeks authority to search the residence of VARELA, the car he uses, and the person of VARELA when agents attempt to execute the arrest warrant on him for the purpose of gathering additional evidence of drug trafficking activity.

## IV. STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   Background

11.   In September 2019, HSI began investigating a drug trafficking organization headed principally by Guadalupe TRUJILLO Garcia, who is known as "El Profe" (the "EL PROFE DTO"). Investigators understand that this DTO smuggles substantial quantities of methamphetamine, cocaine, and heroin into the Uni6ted States for further distribution. A confidential source ("CS-1") based in Mexicali, Baja California, Mexico, has been in direct communication with TRUJILLO and has identified him as a principal in these smuggling and distribution efforts. CS-1 has also reported that TRUJILLO has sought to arrange the smuggling of bulk cash, which investigators believe is bulk-cash proceeds of drug trafficking, back to Mexico from points in the United States as far away as Missouri, and has sought to smuggle firearms into Mexico from Bakersfield, California.[1]

12.   Investigators have developed evidence that corroborates that TRUJILLO is the principal of the EL PROFE DTO (in other words, that he is the "El Profe" identified by CS-1).

---

[1] CS-1 has been cooperating with law enforcement since February 2018. CS-1 does not have any criminal history. CS-1 is cooperating in exchange for remuneration. To date, CS-1 has been paid $25,000. Investigators are not aware of instances in which CS-1 has been dishonest. Investigators have been able to corroborate information provided by CS-1; in some instances, information from CS-1 has helped investigators apprehend and arrest other people for drug-related offenses, and to make seizures of controlled substances. As a result, investigators believe CS-1 is reliable.

In October 2019, CS-1 informed investigators that TRUJILLO had purchased a property in Mexicali and recorded the deed under the name "Nieves Renteria-Medina." Investigators reviewed DHS records for this name and found that Nieves Renteria-Medina is a lawful permanent resident, and that her spouse had petitioned for her permanent residence. Renteria's spouse is TRUJILLO, and he also presently has status as a legal permanent resident. Investigators found a photograph of TRUJILLO in DHS immigration databases and showed it to CS-1, who identified the photograph as El Profe.

**B.   October 2019 Communications and Controlled Purchase**

13.   On October 9, 2019, CS-1 engaged in a consensually monitored call, observed by investigators to the phone number 52-653-164-3653 (the "3653 Number"), which CS-1 had provided for TRUJILLO. CS-1 told TRUJILLO that CS-1 had a relative in Los Angeles who wanted to buy methamphetamine; TRUJILLO responded that he had ten pounds ready for sale, and that the price was $850 per pound. Subsequently, TRUJILLO provided CS-1 with the phone number 951-489-2301 (the "2301 Number"), for the contact in Los Angeles. TRUJILLO said this point of contact went by "Rafa," and that CS-1's relative should tell Rafa he was calling on behalf of "Victor."

14.   On October 10, an undercover agent ("UC-1") – who was posing as CS-1's cousin – called the 2301 Number, looking for Rafa and claiming to call on behalf of Victor. The user of the 2301 Number confirmed he was Rafa, and said he understood that UC-1 was looking for "some ladies because he was going to

party."[2] UC-1 said that UC-1 was in the San Diego area; Rafa said he could not travel that far south, but could meet UC-1 in San Bernardino. UC-1 asked to conduct the meeting the following week, but Rafa said the "ladies" would probably not be available anymore because he was constantly distributing them at the bosses' direction. Rafa added that he got instructed by the bosses to take "five, two, or twenty" to various people.

15.   Following the October 10 call, UC-1 received a new phone number for Rafa from CS-1 – 951-489-6187 (the "6187 Number"). On October 22, UC-1 called the 6187 Number and a person with the same voice as the user of the 2301 Number (*i.e.*, Rafa) answered. Rafa told UC-1 he was ready and waiting, and the two confirmed a meeting the next day. UC-1 confirmed that UC-1 would be in San Bernardino the next day and would call Rafa when near the intersection of Interstate-215 and Interstate-10. UC-1 said the meeting would occur around noon, and Rafa said, "I have things at a warehouse and they close at eight." Rafa also asked how many "girls" UC-1 was taking, and UC-1 said UC-1 wanted five. Rafa said he could accommodate that, and UC-1 confirmed the price of $850 per pound.

16.   Following these calls, on October 23, UC-1 and UC-2 conducted a controlled purchase of five pounds of methamphetamine. At about 12:40 p.m., UC-1 called the 6187 Number when the UCs had arrived at the parking lot of a Walmart

---

[2] Consensually monitored calls and intercepted communications in this investigation occurred in English and Spanish. This memorandum provides good-faith summary translations of Spanish-language communications; as needed, we will secure certified translations before trial.

at the noted intersection. Rafa said, "let me just pick up the things" and added that he needed twenty minutes.

17.   At about 1:05 p.m., Rafa called back and said he was driving a grey Honda (not SUBJECT VEHICLE 1). Three minutes later, a grey Honda drove into the parking lot and parked next to UC-1's truck. UC-1 got out of the truck and into Rafa's car, and conducted the purchase. (This was documented by aerial coverage, observing agents, and recording equipment on UC-1.) After conducting the purchase, UC-1 got back into UC-1's truck and took the purchased drugs for testing, where they tested positive as 5.06 pounds of methamphetamine. UC-1 and observing agents also confirmed that "Rafa" was VARELA by comparing their observations to his DMV photo.

### C.   June 2021 Arrest

18.   On June 26, 2021, San Bernardino Police Officers were conducting their ordinary duties, patrolling in a marked patrol vehicle and wearing their official uniforms. At about 10:21 p.m., Officers responded to the area of West Belleview and North Eureka Streets, due to a "shots fired" call. Specifically, they received information that an adult Hispanic man was standing outside firing a gun in the air. Upon arrival at the scene, the Officers learned from an airborne unit that just south of the intersection, an adult Hispanic man was changing his clothes and getting into the driver's seat of a silver Honda van. Officers conducted a traffic stop of the silver Honda van and removed the driver, VARELA. Officers removed VARELA from the van without incident.

19.    Following the stop of VARELAS, Officers searched the silver Honda van. In the center console next to the driver's seat, they found three medium-sized Ziploc bags, each containing multiple smaller baggies that contained crystalline substances and white powdery substances, which the searching Officer recognized as consistent with the appearances of methamphetamine and cocaine. One Ziploc bag contained fourteen baggies; nine contained a substance appearing to be methamphetamine and had a gross weight of 15.7 grams, and five contained a substance appearing to be cocaine with a gross weight of 31.5 grams. The second Ziploc bag contained twenty-five baggies, which had a gross weight of 17.5 grams; and the third Ziploc bag contained twelve baggies, which had a gross weight of 3.3 grams.

20.    Officers also searched VARELA; in his left pocket, they found about $5,000 in cash, $100 and $50 denominations, and in his right pocket, they found about $2,351 in cash rubber-banded together, and an additional $155.87 in loose cash and coins. In VARELA's right pocket, Officers also found two small baggies containing a substance they recognized as consistent with the appearance of methamphetamine. Following this search, another Officer transported VARELA to the local detention facility; in response to that Officer's questions, VARELA denied having any additional drugs on him, but Officers at the facility found three additional baggies containing suspected cocaine (with a gross weight of 5.3 grams).

21.    From my training and experience, I believe the items seized from VARELA are consistent with drug trafficking. I am

aware that drug dealers commonly package end-user quantities of drugs for sale into small baggies; here, the fact that VARELA had more than forty baggies in the silver Honda van is, to me, an indication that he possessed these baggies for the purpose of distributing them. Moreover, I am aware that drug traffickers commonly have large amounts of cash, as they cannot use ordinary financial systems to conduct their business. Here, VARELA was in possession of more than $7,500, which I believe is some evidence that he had been gathering proceeds from trafficking.

**D.   Indictment of VARELA and Others**

22.   On January 20, 2022, a federal grand jury sitting in the Southern District of California returned an indictment charging, inter alia, VARELA with conspiring to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine between October 9, 2019 and September 10, 2020.

**E. Investigation of SUBJECT PREMISES 1 & SUBJECT VEHICLE 1**

23.   Investigators conducting surveillance on VARELA have found that he appears to live at SUBJECT PREMISES 1 and to drive SUBJECT VEHICLE 1. I note the following.

24.   On December 15, 2021, HSI Special Agent Kristopher Templin conducted surveillance at SUBJECT PREMISES 1, and observed VARELA arrive at approximately 4:00 p.m. in SUBJECT VEHICLE 1. VARELA used a parking spot that, SA Templin believes, would most likely only be used by a resident of the home. VARELA used a key to open the front door, and briefly walked inside the residence, returned outside and began repairing Christmas lights

that were attached to the front of the Subject Residence. After finishing repairing the lights, VARELA went back inside SUBJECT PREMISES 1. SA Templin took a series of photographs of VARELA.

25.   On January 24, 2022 and January 25, 2022, SA Templin again conducted surveillance at SUBJECT PREMISES 1 early in the morning. On both occasions, at approximately 7:00 a.m., SUBJECT VEHICLE 1 was backed into the same parking spot in the driveway of SUBJECT PREMISES 1. At approximately 8:15 a.m. on January 25, 2022, a Hispanic male adult (HMA) walked out of SUBJECT PREMISES 1, and drove away in SUBJECT VEHICLE 1. The HMA closely resembled VARELA, but was wearing a hooded sweatshirt, and SA Templin could not identify him for certain.

26.   The registered owner of SUBJECT VEHICLE 1 is Laura Varela-Carrillo, who is believed to be the child of Veronica CARRILLO-Duenas and VARELA. Laura Carrillo and Veronica Carrillo have several international crossings together, and law enforcement databases show that VARELA and Veronica Carrillo have resided at the same residence on at least four previous occasions. According to law enforcement databases, Veronica Carrillo currently resides at SUBJECT PREMISES 1. Based on the believed family relationships, previous common residences and the multiple sightings of VARELA at SUBJECT PREMISES 1, SA Templin believes that VARELA currently resides there and is the primary driver of SUBJECT VEHICLE 1.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

27.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

   e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

   f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

   g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal activity.

      h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

    28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain

16

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

     a.   Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To unlock
a device enabled with a fingerprint unlock function, a user
places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

     b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts. Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time. I do not know
the passcodes of the devices likely to be found in the search.

     c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress VARELA's thumbs and/or fingers on the
device(s); and (2) hold the device(s) in front of VARELA's face

with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

31.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

32.   For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in SUBJECT PREMISES 1 described in Attachment A-1, in SUBJECT VEHICLE 1 as described in Attachment A-2, and on VARELA's person as described in Attachment A-3.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
January, 2022.

_____
THE HONORABLE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The premises to be searched is located at 1278 West 27th Street, San Bernardino, CA, 92405 ("SUBJECT PREMISES 1"). SUBJECT PREMISES 1, as depicted in the photograph below, is a blue one-story, single-family house with white shutters that sits on the north side of West 27th Street. There is a detached garage on the northeast side of the house.



**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances, distribution of controlled substances), 21 U.S.C. § 843(b) (use of a communications facility in furtherance thereof) and 21 U.S.C. § 846 (conspiracy and attempt to possess with intent to distribute, and to distribute, controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages

i

over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

     e.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

     f.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

     g.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.    Contents of any calendar or date book;

k.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

l.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

m.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

iv

modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

        3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

        4.   In searching digital devices (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

            a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location. The search team shall

complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant. The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

      b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

      i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized. The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

      ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

      iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

      c.   The search team will not seize contraband or
evidence relating to other crimes outside the scope of the items
to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

vi

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the

government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

7.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress VARELA's thumbs and/or
fingers onto the fingerprint sensor of the device (only when the
device has such a sensor), and direct which specific finger(s)
and/or thumb(s) shall be depressed; and (2) hold the device in
front of VARELA's face with his eyes open to activate the
facial-, iris-, or retina-recognition feature, in order to gain
access to the contents of any such device. In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

8.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.